UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 04-10017-NMG

_____  )
                                     )
MARVIN SKOLNICK,                     )
                                     )
    Plaintiff                        )
                                     )
v.                                   )
                                     )
MAX MOTORS, INC., MAX FOREIGN        )
CARS, INC. and BARRY JAGOLINZER      )
                                     )
    Defendants                       )
_____  )

## JOINT PRE-TRIAL MEMORANDUM

1.    Names and addresses of trial counsel

| Counsel for the plaintiff: | Counsel for the defendants: |
|---|---|
| Sol J. Cohen | Patricia M. Rapinchuk |
| COHEN & SALES | Robinson Donovan, P.C. |
| 43 Thorndike Street | 1500 Main Street, Suite 1600 |
| Cambridge, MA 02141 | Springfield, MA 01115 |
| (617) 621-1151 | (413) 732-2301 |

2.    Jury vs. non-jury

This will be a jury trial.

3.    Summary of the parties' positions on liability and damages

      A.  Plaintiff's position

      Liability

This is a handicap/disability discrimination case brought pursuant to the Americans with

Disabilities Act ("ADA") and M.G.L. Chapter 151B, and includes a claim under the Family

413156

Medical Leave Act ("FMLA").  The defendants Max Motors, Inc. and Max Foreign Cars, Inc. are dealers in automobiles.  Defendant Barry Jagolinzer is their sole shareholder and president.  Plaintiff Marvin Skolnick was hired by the defendants their Business Manager in June, 1999.  Plaintiff earned 15% of the gross revenue generated by his department.  Mr. Skolnick's work performance during his employment with the defendants was very good.

     Mr. Skolnick is diabetic.  At the time of his hire, Mr. Skolnick was only able to walk with the assistance of two strap on cane devices as a result of a diabetic neuropathy condition.  The defendants were aware of Mr. Skolnick's record of impairment to his ability to walk and perceived him as disabled.

     On December 25, 2002, although the diabetic neuropathy condition that impaired his ability to walk had improved, Mr. Skolnick fell in the shower while on vacation, and sustained a fracture of his ankle.  This injury required surgery on December 31, 2002, with permanent implantation of hardware for stabilization purposes.  The ankle fracture of December 2002 was a qualifying disability under the Americans with Disabilities Act ("ADA") and M.G.L. Chapter 151B's prohibition against disability discrimination because of its nature and severity and because it was superimposed on a long record of impairment to his ability to walk.

     In early January, 2003, Mr. Skolnick communicated a need for a reasonable accommodation for the impairment to his ability to walk.  He sought a medical leave until the end of January, 2003.  He communicated with the defendants relative to his medical status, on a regular basis.  It appeared that the defendants would accommodate Mr. Skolnick's need for a medical leave. On or about January 20, 2003, Mr. Skolnick reiterated that he intended to return to work at the end of January, 2003.  He also sought to come into work on January 28, 2003 in the middle of the day to set up his office appropriately to return to work full time at the end of

that month. He reiterated this request on January 27, 2003. The defendants then terminated his employment. The defendants did not provide Mr. Skolnick with the accommodations he requested, despite their obligations under the ADA and Chapter 151B to do so.

The reason articulated by the defendants for Mr. Skolnick's termination is unlawful and pretextual. The defendants' articulated reason for the termination was Mr. Skolnick's failure to show up for work on the morning (as opposed to the afternoon, as Mr. Skolnick proposed) of January 28, 2003. First, Mr. Skolnick had a disability and has a record of impairment to his ability to walk. Therefore, under Chapter 151B and the ADA, it was not exclusively within Mr. Jagolinzer's authority to decide when and under what circumstances Mr. Skolnick would return to work. This determination was a function of Mr. Skolnick's physical condition and whether the leave requested would have unduly burdened the employer. Mr. Skolnick's physical impairment required him to be out until the afternoon of January 28, 2003.

The defendants' reason for the termination is internally inconsistent. It is illogical that this employer would terminate Mr. Skolnick's employment January, 2003, after four years of service without any performance problems, over coming into work in the afternoon as opposed to the morning of his first day back after serious injury.

The pretextual nature of the defendant's reason for the plaintiff's termination is further supported by the facts and evidence in this case. The defendants found Mr. Skolnick's medical leave to be a nuisance. Additionally, the evidence leads to the conclusion that the defendants perceived the plaintiff as too disabled to return to work at full capacity. The defendants took back Mr. Skolnick's company car. Further, they found a replacement for Mr. Skolnick within a day or two of his termination. This is inconsistent with the defendant's prior history of multiple interviews of candidates.

Additionally, although the defendants testified that they decided to terminate the plaintiff on January 28, 2003 due to what they term a "no show" on January 28, 2003, the documents in the case show that the defendants actually decided to terminate the plaintiff on January 27, 2003. The January 27 date corresponds with the defendant's being notified of Mr. Skolnick's intended first day of full time work. The evidence leads to the conclusion that the defendant's articulated reason for the plaintiff's termination is a pretext for disability discrimination.

Further, to be successful on the state (M.G.L. Chapter 151B, Section 4(16)) claim, Mr. Skolnick need only show that he *alleged* to be a qualified individual with a disability (one who could perform the essential functions of the job with a reasonable accommodation), and that the defendants failed to engage in any interactive process to determine whether there was a reasonable accommodation that it could provide. The defendants failed to engage in such a process. In fact, such a process may have resulted in dialogue in which Mr. Skolnick would have explained that he never intended to return until the end of January, and that he needed to come in for a half day to set up his office, and may have avoided Mr. Jagolinzer's abrupt decision of termination. Even assuming that Defendant Jagolinzer is telling the truth that the January 28, 2003 "no show" was the reason for the termination, his failure to engage in an interactive process with Mr. Skolnick was a separate violation of Chapter 151B. This failure directly resulted in Mr. Skolnick's termination.

The defendants have also violated Mr. Skolnick's rights under the FMLA. Separate from the ADA and Chapter 151B violations, the defendants failed to provide Mr. Skolnick with up to 12 weeks of job protected medical leave for the serious health condition resulting from his ankle fracture in December 2002, as required by FMLA.

Mr. Skolnick's damages under Chapter 151B include lost back pay, front pay, past and future benefits, and emotional distress. Further, a jury may award punitive damages. Lastly, if Mr. Skolnick prevails, the court would award him reasonable attorney's fees and costs, as well as interest on all of the above excepting attorney's fees.

Economic Damages

Analysis 1.

Mr. Skolnick earned $95,001.00 in 2002. He earned $70,583.00 in 2004 at his new employment. This analysis bases his losses on those assumptions going forward from 2002.

a)   2003 January to September losses: $63,333.00. This represents Mr. Skolnick's 2002 earnings prorated for these eight months in 2003 during which he was unemployed and searching for replacement work.

b)   September 2003 to present:: $50,870.75. This calculation is based on a difference in earnings, prorated (at a rate of $2,034.83 per month) for the 25 months in this period.

c)   Present day to January 2009 (projected retirement age of 67 years old): $81,393.20. This calculation is based on a difference in earnings, prorated (at a rate of $2,034.83 per month) for the 41 months in this period.

Total economic losses: $195,596.95

Analysis 2:

Under the defendants pay plan agreement with Mr. Skolnick, he would have earned 15% of the gross income of his department. This amounts to $87,354.30 in 2003, and $110,725.95 in 2004. In his replacement work, Mr. Skolnick actually earned $31,586.00 in 2003, and $70,583 in 2004.

Assuming the 2004 $110,725.95 earnings for Mr. Skolnick's old position with the defendants, and his actual 2004 earnings at his replacement work, Mr. Skolnick I sustaining a net loss of $40,142.95. Projected to age of retirement of 67, this totals $160,571.80 in projected future losses.

Total economic losses: $256,481.80.

B. <u>Defendants' position</u>

Max Motors, Inc. d/b/a Somerset Chrysler Jeep and Max Foreign Car Sales, Inc. d/b/a Somerset Subaru are two auto dealerships. Barry Jagolinzer is the sole shareholder of both corporations. Steven Jagolinzer is the general manager of Somerset Subaru and Michael Jagolinzer is the general manager of Somerset Chrysler/Jeep. The two dealerships between them employ slightly more than 50 individuals.

Skolnick was hired by Barry Jagolinzer as the Business and Finance manager of both dealerships on June 29, 1999. In that position, Skolnick would be introduced to a customer who had already made a commitment to purchase a vehicle and he would subsequently attempt to arrange financing and attempt to sell after market items such as alarm systems and extended warranties. He was also responsible for generating and completing the necessary paperwork. The most important aspect of Skolnick's job was taking personal credit information from consumers, which involved sensitive privacy issues. Skolnick's job duties never changed during the course of his employment. His work performance was good, and Barry Jagolinzer never considered any formal discipline and never considered terminating Skolnick through December, 2002. He was paid straight 15% commission.

At the time that he was hired, Skolnick was walking with two canes and advised Barry Jagolinzer that he was recovering from a stroke. Although the job he was hired for normally involved walking up and down stairs and walking between the two dealerships, Barry Jagolinzer assured Skolnick that the dealership could accommodate him. Skolnick's job was essentially an office job, but involved a substantial amount of interaction with customers arranging financing and insurance. During the times when Skolnick had difficulty walking, customers were brought

to him from the second dealership and arrangements were made so that he would not have to climb the stairs. Throughout his employment, Skolnick was allowed to take time from work for physical therapy appointments.

After approximately a year, Barry Jagolinzer observed that Skolnick had apparently recovered from his stroke enough to walk without any assistance. For the last several years of Skolnick's employment, Barry Jagolinzer observed no signs of any disability and did not perceive Skolnick as disabled. Although Skolnick had told Barry Jagolinzer at one time that he had to eat regularly to keep his sugar up, Jagolinzer was not aware that this condition limited Skolnick in any way.

At some point in late December, 2002, Skolnick failed to show up at work for his regular hours. After several attempts to reach him, Barry Jagolinzer finally spoke with him by phone. Skolnick advised him that he had fallen in the shower at home and broken his ankle. In fact, Skolnick has testified that he slipped in a shower at a hotel in a casino. Barry Jagolinzer expressed his sympathy, encouraged Skolnick to keep a positive attitude about his recovery and asked him whether he had any idea when he would be able return to work. At the time, Skolnick informed Barry Jagolinzer that he believed he might be able to return to work in 2-3 weeks. Barry Jagolinzer advised Skolnick to stay in touch with the office by telephone at a minimum of once a week to keep them informed of his progress, and also advised him that he would need a return to work note from his doctor in order to return. Barry Jagolinzer also reminded Skolnick of how critical his position was to both dealerships. The Business and Finance Manager was the only individual in the dealerships who dealt with sensitive private matters of customers regarding financing and insurance. In order to protect customers' privacy, the dealership attempted to involve only a small number of people in these transactions. Also, there was no one else in

either of the dealerships whose job it was to fill the business and finance function. During Skolnick's absence, Michael Jagolinzer filled in for him, which prevented him from adequately performing his own job. This situation decreased the dealership's revenue and also decreased Michael's effectiveness in his primary job. Skolnick was aware of this situation, and the critical role he played.

The defendants had no personal knowledge about Skolnick's ability or inability to work after his accident because Skolnick never provided them with medical documentation, never came to the dealership and did not keep them regularly informed of his circumstances, as requested. The defendants regularly attempted to contact Skolnick by phone, often leaving messages when he was not there. While Skolnick eventually returned the phone calls, he never initiated them as requested. Skolnick advised Michael Jagolinzer and Barry Jagolinzer that he would be returning to work on January 28, 2003, and the defendants expected Skolnick to resume his employment as of that date and made plans accordingly. The dealerships were anxious for Skolnick to return.

On January 28, 2003, Barry Jagolinzer was at an automobile auction. He received a phone call from Michael Jagolinzer, who was at the dealership, asking him if he knew where Skolnick was. Barry Jagolinzer advised Michael Jagolinzer that he had expected that Skolnick would be there, asked him to check with the receptionist to determine whether he had called in, and then to call Skolnick at home to find out what was going on. After learning that Skolnick had not called in, Michael Jagolinzer called Skolnick at home to find out why he was not at work as promised. Skolnick advised Michael Jagolinzer that he was not coming in until later that afternoon. Michael was shocked at Skolnick's response, because Skolnick had previously told him and Barry that he would be back to work that day. Skolnick had never advised anyone that

it was his intent to come in to work in the afternoon of January 28, 2003 to rearrange his office or to learn a new computer system, nor did he advise anyone that he planned to "attempt to return to full time work" on Thursday, January 30, 2003.  In fact, Skolnick's office was arranged in the same manner that it was arranged when he was walking with two canes and nothing would have had to have been done to that office to make it accessible to him on crutches, and there was no new computer system to learn. Also, Barry Jagolinzer had already informed Skolnick in a prior conversation that the company would be able to accommodate him during his recovery by not requiring him to walk between the dealerships or up and down stairs as they had done previously when he was walking with canes.

After Barry Jagolinzer learned that Skolnick had not shown up for work as promised, he discussed it with Steven Jagolinzer and decided that Skolnick's irresponsible behavior over the last several weeks, and his failure to show for work as promised or to call in, was unacceptable and that the company could no longer tolerate this conduct.  Barry Jagolinzer advised Steven Jagolinzer to call Skolnick and advise him that his employment was terminated.  Skolnick was terminated from his employment on January 28, 2003 because he failed to show up for work as he reported he would and because he had failed to communicate regularly with his employer during the time that he was recovering from a broken ankle which he sustained during an accident.  Barry Jagolinzer regarded the incident as a no-call, no-show, which was intolerable, especially in a key employee.  Skolnick's position was one which required a high degree of responsibility and integrity, and Barry Jagolinzer had lost confidence in Skolnick due to his behavior.

Skolnick will be unable to show that he has a disability that would be recognized under M.G.L. c. 151B or the ADA.  In addition, the defendants in this case did not regard Skolnick as

having a disability. They believed that the condition from which Skolnick suffered when he was first hired had been completely resolved, and they had no knowledge about the underlying condition of diabetic neuropathy. The defendants have and will testify that they did not regard Skolnick as being substantially impaired as that term is defined under the statutes at the time of his termination.

Skolnick was terminated for legitimate non-discriminatory reasons, having nothing to do with any alleged disability. In fact, the defendants were under the impression, an impression created by Skolnick, that this was a temporary injury caused by a fall in a shower that would eventually heal. The defendants had no reason to believe that the injury was related in any way to Skolnick's diabetes or to the condition that had caused his previous stroke.

Barry Jagolinzer hired Skolnick at a time when he had visible and significant difficulty walking. Barry Jagolinzer hired Skolnick nonetheless and accommodated his impairment with absolutely no reason to believe that the condition would ever improve. Under the same actor inference, it would be illogical to think that Barry Jagolinzer would terminate Skolnick because of a temporary broken ankle when he was willing to hire and accommodate him under much more serious circumstances.

Regardless, however, of the cause or duration of Skolnick's injury, the defendants were ready, willing and able to accommodate him as they had done in the past. Barry Jagolinzer had already discussed with Skolnick the accommodations that the defendants were willing to provide upon Skolnick's return to work. While the defendants were eager for Skolnick to return to work, they certainly would have granted him further medical leave as required by his physician, had such a leave been requested. Instead, Skolnick, after nearly a month of failing to keep the defendants apprised of his progress, clearly and unequivocally advised Barry Jagolinzer that he

planned to return to work on January 28, 2003. During that conversation, there were no requests for accommodations and no qualifications. When he failed to show up or call in that morning, Barry Jagolinzer was understandably concerned, especially given Skolnick's failure to initiate communication over the past month as he had been requested to do. When he learned of Skolnick's cavalier response to the phone call inquiring about his whereabouts, Jagolinzer reached the conclusion that Skolnick could no longer be relied upon. The position of Business and Finance Manager required a high level of responsibility, a quality which had been seriously lacking in Skolnick's behavior while he was out on leave. His failure to show up or call in on January 28, 2003 was further evidence of this, and caused the defendants to lose confidence in him.

   Damages

   Skolnick is currently employed at Brookline Audi, where he began in 2003. During the time that he was unemployed, he collected unemployment compensation benefits in the amount of $14,572, which the Respondents contend should be used to offset any potential back pay award.

   At his deposition, Mr. Skolnick was very unclear about the method used to calculate commissions in his job with Brookline Audi. It is reasonable to assume, however, that his income will increase on that job as it did with Max Motors, due in part, at least, to the rising cost of automobiles. In addition, it is purely speculative to calculate front pay through 2009 in this market.

4.  Facts established by pleadings or stipulation

  1. The defendants Max Motors, Inc. and Max Foreign Cars, Inc. are dealers in automobiles. Barry Jagolinzer is their president, sole director, and sole shareholder.

2. Plaintiff Marvin Skolnick was hired by the defendants as the Business Manager for both dealerships in June 1999.

3. At the time of hire, Mr. Skolnick walked with the assistance of two strap on cane devices.

4. Mr. Skolnick earned 15% of the gross profit of the defendants' Business and Finance departments, minus any charge backs.

5. The two defendants' Business and Finance departments combined gross profit in 2003 was $582,362.00.

6. The two defendants' Business and Finance departments combined gross profit in 2004 was $738,173.00.

7. The total <u>combined</u> number of individuals employed by the two corporate defendants was over 50 at all times relevant to this case. Neither corporate defendant alone had 50 employees during those times.

8. In December, 2002, Mr. Skolnick sustained a non-work related ankle fracture, which required surgery.

9. The defendants terminated Mr. Skolnick's employment in January, 2003.

5. Contested facts.

a. Whether Mr. Skolnick was able to perform the essential functions of his position, with reasonable accommodations.

b. The amount of the plaintiff's lost earnings and the value of any lost fringe benefits.

c. Whether the plaintiff was a qualified handicapped individual.

d. Whether the plaintiff had a record of impairment to a major life function, to wit: walking, that was known to the defendants.

e. Whether the defendants perceived the plaintiff as disabled.

f. Whether the plaintiff was terminated because of a disability or because of the defendant's perception of the plaintiff as disabled.

g. The nature and extent of the plaintiff's communications with the defendants during his medical leave in January, 2003.

h. Whether the defendants' articulated reason for the termination of the plaintiff's employment was a pretext for discrimination on the basis of disability.

i. Whether the two corporate defendants together constitute or form one integrated enterprise so that they have the requisite number of employees for purposes of FMLA liability.

j. Whether the defendants failed to provide the plaintiff with up to 12 weeks of job secured leave under the FMLA.

6. <u>Jurisdictional questions.</u>

None.

7. <u>Issues of law.</u>

a. The extent to which the plaintiff may claim future lost earnings. The plaintiff contends that the plaintiff may make a claim for future lost earnings ("front pay") within his state law claim (pursuant to M.G.L. Chapter 151B), provided that the claim is not speculative. *See Handrahan v. Red Roof Inns, Inc.,* 43 Mass.App.Ct. 13 (1997); and *Conway v. Electro Switch Corp.*, 402 Mass. 385, 388-389 (1988).

b. Whether the Court should instruct the jury as to punitive damages. The plaintiff contends that the facts of this case warrant a jury instruction as to punitive damages.

c. Whether the plaintiff will be able to show that he has a disability that would be recognized under M.G.L. c. 151B or the ADA. A temporary fracture of a bone is not the type of disability recognized by most Courts under either statute. See, e.g., *Charles v. D&F Mason, Inc.,* 2000 U.S. App. LEXIS 23943 (2nd Cir. 2000) (unpublished), where the Court found that the employee's fractured toe, which caused him to miss work for five weeks, was of insufficient duration to be a disability. See also, *Carroll v. Xerox Corp.,* 2002 U.S. App. LEXIS 12852 (1st Cir. 2002) where the Court held that an inability to work for three months was not of sufficient duration to constitute a disability.

d. Whether the plaintiff can establish that the defendants regarded him as being disabled. There must be evidence that the employer knew that the employee had an impairment that substantially limited a major life activity and treated him as such, or that the employee did not have an impairment, but was treated as having a substantially limiting impairment by the employer. 29 C.F.R. § 1630.2(1).

e. Whether the two corporate defendants constitute one "integrated enterprise" employer for purposes of determining whether they have the requisite number of employees to be subject to the requirements of the FMLA. *See Baker v. Stuart Broadcasting Co.,* 560 F.2d 389, 391 (8th Cir. 1977); *see also Romano v. U-Haul International,* 233 F.3d 655, 664-65 (1st Cir. 2000).

8. <u>Requested amendments to the pleadings.</u>

None.

9. <u>Additional matters to aid in the disposition of the action.</u>

None.

10. <u>Probable length of trial.</u>

Five days.

11.   Names and addresses of witnesses.

   Plaintiff's witnesses

   1.   Marvin Skolnick
        Randolph, Mass.

   2.   Gloria Skolnick
        Randolph, Mass.

   3.   Barry Jagolinzer
        c/o Max Motors

   4.   Michael Jagolinzer
        c/o Max Motors

   5.   Steven Jagolinzer
        c/o Max Motors

   6.   Jeff Chase
        59 Red Cedar Drive
        Cranston, RI 02920

   7.   Chuck Soule
        226 Charge Pond Rd
        Wareham, MA 02571

The plaintiff reserves the right to call all witnesses listed by the defendants, any witnesses necessary for the introduction of otherwise admissible documents and things, and to supplement this list with reasonable notice to the defendants.

   Defendants' Witnesses

   1.   Barry Jagolinzer
        c/o Max Motors

   2.   Michael Jagolinzer
        c/o Max Motors

   3.   Steven Jagolinzer
        c/o Max Motors

    4.      Jeff Chase
           59 Red Cedar Drive
           Cranston, RI 02920

The defendants reserve their right to call all witnesses listed by the plaintiff, any witnesses necessary for the introduction of otherwise admissible documents and things, and to supplement this list with reasonable notice to the plaintiff.

12.    <u>Exhibit list.</u>

    1.    The plaintiff's medical records related to his diabetic neuropathy condition and his December 2002 ankle fracture.

    2.    The plaintiff's personnel file, including a "Payroll Status Change" dated January 27, 2003.

    3.    The Massachusetts Department of Employment & Training records relative to plaintiff's claim for unemployment benefits.

    4.    Plaintiff's W-2 forms and federal tax returns for years 2003 and 2004.

    5.    Defendant's revenue records for the F&I department from 2003 to present.

    6.    The defendants' position statement filed with the Massachusetts Commission Against Discrimination.

    7.    Plaintiff's W-2 forms and federal tax returns for the years 1997-2002.

    8.    The cane like devices that the plaintiff's used to assist him to walk at the beginning of his employment with the defendants.

    9.    The Plaintiff's Complaint filed with the MCAD.

The parties agree and acknowledge that this list of exhibits is not a final list of agreed to exhibits, and represent that they will confer within a reasonable time prior to trial for the purpose of amending and/or supplementing this, and to pre-mark both agreed exhibits (with one set of consecutive numbers), and contested exhibits (with one set of identifying letters)

Respectfully submitted,

| For the plaintiff, | For all defendants, |
|---|---|
| Sol J. Cohen /s/ | Patricia M. Rapinchuk /s/ |
| Sol J. Cohen | Patricia M. Rapinchuk |
| BBO # 630776 | BBO # 556149 |
| COHEN & SALES | Robinson Donovan, P.C. |
| 43 Thorndike Street | 1500 Main Street, Suite 1600 |
| Cambridge, MA 02141 | Springfield, MA 01115 |
| (617) 621-1151 | (413) 732-2301 |